UNITED STATES of America
v.
Ephriam McGLONE.

UNITED STATES of America
v.
Foster L. DODSON.
Crim. Nos. 13081, 13082.

United States District Court
E. D. Virginia,
Norfolk Division.
April 26, 1967.

Rogert T. Williams, Asst. U. S. Atty., Norfolk, Va., for the United States.

Robert G. Doumar, Doumar, Pincus, Anderson & Knight, Norfolk, Va., for defendants.

## MEMORANDUM

WALTER E. HOFFMAN, Chief Judge.

These prosecutions for the theft of goods moving as part of a shipment in foreign commerce present a novel question as to the search powers of customs officials.

On September 27, 1965, the Japanese vessel HAGUROSAN MARU was unloading cargo at Lambert's Point Docks in Norfolk. The customs inspector working the vessel advised other customs officials that a large quantity of merchandise was missing from the ship. The customs officials knew from past experience that longshoremen might be pilfering the merchandise. Accordingly John Blaski, a Customs Port Investigator, stopped the defendant McGlone, a longshoreman, as McGlone was leaving the pier area in his automobile and, after identifying himself as a customs official, he asked McGlone if he could search the car. McGlone opened the trunk of the automobile as requested, and Blaski found two small Japanese transistor radios of the type which were missing from the vessel's cargo. The radios were hidden inside a rubber boot.

A little later on the same evening agent Blaski stopped the other defendant, Dodson, and after identifying himself as a customs official he asked permission to examine Dodson's parked car. Dodson also allowed him to do so by unlocking the car door, and Blaski discovered four more Japanese radios lying under some clothing on the front seat, and a fifth radio in the trunk of the automobile.

At the time the vehicles were searched, they were in a parking area directly in front of Pier "N", but not on the pier itself. The entire Lambert's Point area is surrounded by a fence and a guard is maintained at the gate. The automobiles in question were well within the fenced-in area.

Blaski admitted that, at the time he searched the defendants' vehicles, he had no information pointing to either McGlone or Dodson, other than the general suspicion that longshoremen were pilfering from the vessel. He did not have a warrant to search either car.

The manifest and entry documents of the HAGUROSAN MARU revealed that the ship was carrying ten cases of radios of the type found in the defendants' cars, and that five of these cases were empty on discharge while a sixth case was missing entirely. Out of a total of 1000 transistor radios, 600 were missing. The customs entry on the shipment of radios was not made until September 29, 1965, two days after the defendants' automobiles were searched. Thus at the time of the alleged thefts the goods were still in the custody of the customs officials.

We think the evidence clearly establishes the guilt of the defendants to the offenses charged, if the result of the searches of defendants' automobiles is admissible as evidence. We therefore turn to this crucial issue.

■■ As already noted, agent Blaski had no warrant to search either car; and clearly he did not have probable cause to suspect either defendant, since he admitted that he only had a blanket suspicion that longshoremen were engaged in general pilfering. Such a general suspicion does not constitute probable cause. Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959). Therefore, these searches and the subsequent seizures can only be sustained if (as the government contends) they are in the nature of "border searches",[1] since it is well settled that a border search can be made without a search warrant or probable cause. Carroll v. United States 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543, (1925); Hammond v. United States, 356 F.2d 931 (9th Cir. 1966); Mansfield v. United States, 308 F.2d 221 (5th Cir. 1962).

The customs statutes and regulations confer broad powers of arrest, search and seizure upon customs officers in connection with the introduction of articles of an illegal nature, or which are subject to duty, into this country. Thus 19 U.S.C. § 482 permits any officers who are authorized to board or search vessels to "stop, search, and examine * * * any vehicle, beast, or person" on which or whom they suspect there is merchandise "which is subject to duty, or shall have been introduced into the United States in any manner contrary to law"; and if they find any merchandise which they have "reasonable cause to believe is subject to duty, or to have been unlawfully introduced into the United States", they shall seize and secure the same for trial.

Another statute, 19 U.S.C. § 1581(a), authorizes any customs officer to "go on board of any vessel or vehicle at any place in the United States" to examine the manifest and other documents and papers and to "examine, inspect, and

---

1. The government does not argue that defendants consented to the search, possibly recognizing that "consent" to search under circumstances such as these has been held to be in reality "implied coercion" and therefore not a knowing waiver of one's constitutional rights. Amos v. United States, 255 U.S. 313, 41 S.Ct. 266, 65 L. Ed. 654 (1921).

search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board". Subsection (e) provides that if, upon examination of the vessel or vehicle, it appears that "a breach of the laws of the United States is being or has been committed" so as to render the vessel, vehicle or merchandise liable to forfeiture or to secure any fine or penalty, then "the same shall be seized and any person who has engaged in such breach shall be arrested."

A third statute, 19 U.S.C. § 1582, provides that the Secretary of the Treasury may prescribe regulations for the search of persons and baggage and that "all persons coming into the United States from foreign countries shall be liable to detention and search by authorized officers or agents of the Government under such regulations".

Pursuant to the authority granted by these and other statutes, extensive regulations have been promulgated with respect to the boarding of vessels or vehicles and the inspection of persons, baggage and merchandise from the same (19 C.F.R. § 23.1); the seizure of vessels, vehicles, aircraft and other conveyances (19 C.F.R. § 23.3); who may make seizures (19 C.F.R. § 23.11); and other related matters.

On their face, these statutes and regulations clearly authorize a search of the type conducted in this case, since the goods involved were being imported into the United States, were subject to duty which had not yet been paid, and were still in the custody of customs agents. The question, however, is not what the statutes purport to allow but rather what the Fourth Amendment to the Constitution commands.

Defendants urge that the present case does not come within the category of a "border search" because both defendants remained within the country at all times, and they were not attempting to illegally introduce anything into the country in contravention of the customs laws. They point out, quite correctly, that the cases relied upon by the government all involved the smuggling of merchandise into the country illegally,[2] rather than the theft of goods already in the country, and argue that while customs officers may have authority to search incoming travelers without probable cause, they do not have such power in this case. While defendants' argument has some merit to it, we cannot agree.

Although defendants are only being tried for the theft of property which was moving as part of a shipment in foreign commerce, the evidence reveals quite clearly that they also committed a customs violation in removing goods from customs custody. 18 U.S.C. § 549.[3] The goods were still within customs jurisdiction at the time of their theft, and since duty had not yet been paid on the goods, and indeed the government would be the ultimate loser unless the goods were located and cleared,[4] it remained the duty

2. Among the cases upon which the government relies are Landau v. United States, 82 F.2d 285 (2d Cir. 1963); Witt v. United States, 287 F.2d 389 (9th Cir. 1961); Bible v. United States, 314 F.2d 106 (9th Cir. 1963); United States v. Beckley, 335 F.2d 86 (6th Cir. 1964); Jones v. United States, 326 F.2d 124 (9th Cir. 1963); Ramirez v. United States, 263 F.2d 385 (5th Cir. 1959); Mansfield v. United States, 308 F.2d 221 (5th Cir. 1962); United States v. Yee Ngee How, 105 F.Supp. 517 (N.D.Cal.1952). All of the above cases involved the smuggling of narcotics into the United States except, *Landau,* which involved the smuggling of Swiss watch movements.

3. Defendants were originally charged with violation of this section as well as the theft of goods moving in foreign commerce, but the customs count in each indictment was dismissed as being fatally defective in that it failed to allege the necessary felonious intent.

4. The documentary evidence and transcript is not clear on the subject of whether duty can be collected for merchandise listed on the manifest which ultimately turns out short and has not been inspected and cleared by customs officials. Knowledge of existing procedures permits the Court to state that duty is on goods listed upon the manifest. However, if the shipment

of customs officials to investigate their disappearance. While the longshoremen working aboard the HAGUROSAN MARU and other incoming vessels were clearly not travelers returning from abroad, they were well aware that they were dealing with merchandise from abroad which was subject to customs control upon its arrival in this country.

█ We deem it worthwhile to note that a search for stolen goods liable to duties has never been held subject to the same strict requirements as the search and seizure of a man's private papers and documents. As the Supreme Court stated in the landmark case of Boyd v. United States, 116 U.S. 616, 623–624, 6 S.Ct. 524, 528, 29 L.Ed. 746 (1886):

> "The search for and seizure of stolen or forfeited goods, or goods liable to duties and concealed to avoid the payment thereof, are totally different things from a search for and seizure of a man's private books and papers for the purposes of obtaining information therein contained, or of using them as evidence against him. The two things differ *toto coelo*. In the one case, the government is entitled to the possession of the property; in the other it is not. The seizure of stolen goods is authorized by the common law; and the seizure of goods forfeited for a breach of the revenue laws, or concealed to avoid the duties payable on them, has been authorized by English statutes for at least two centuries past; and the like seizures have been authorized by our own revenue acts from the commencement of the government. * * * [T]he supervision authorized to be exercised by officers of the revenue over the manufacture or custody of excisable articles, and the entries thereof in books required by law to be kept for their inspection,

are necessarily excepted out of the category or unreasonable searches and seizures."

█ Moreover, it has been recognized since Carroll v. United States, supra, that the search of a vehicle stands upon different grounds from the search of one's dwelling house or other structure, for which a search warrant can be readily obtained. Husty v. United States, 282 U.S. 694, 51 S.Ct. 240, 75 L.Ed. 629 (1931); Brinegar v. United States, 338 U.S. 160 (1949); Henry v. United States, supra. While probable cause is still a requirement in searching automobiles under most circumstances, we believe that the present cases involve situations closely akin to, if not directly the same as, the border search cases.[5] Certainly the same policy considerations which have led the courts to permit border searches upon "mere suspicion", Witt v. United States, 289 F.2d 389 (9th Cir. 1961), are present here as well. The purpose of the broad search powers conferred upon customs agents is twofold: to prevent goods of a contraband nature, such as narcotics, from entering the country, and to enforce the federal laws relating to the payment of duty on inherently legal goods which are brought into the country. While these longshoremen were not responsible for the payment of duty on the imported radios, they were guilty of frustrating the customs laws requiring the payment of same. They were legally responsible for the natural consequences of their acts and it is not incumbent to prove that their intent, in stealing the radios, likewise contemplated a loss of duty to be collected by the government. Moreover, the prevention of widespread looting of imported goods which are still in customs custody presents much the same practical problems of law enforcement as the prevention of smuggling across the border. Considering the "exigencies

---

checks out short and exceptions are noted, a refund is ultimately processed by customs and the government is the final loser from the standpoint of duty. If the defendants disagree, further evidence will be permitted to clarify this issue.

5. The recent case of Thomas v. United States, 372 F.2d 252 (5 Cir., 1967), demonstrates the liberal trend in interpreting the term "border search".

of the situation", McDonald v. United States, 335 U.S. 451, 456, 69 S.Ct. 191, 93 L.Ed. 153 (1948), we believe that the search of the McGlone and Dodson automobiles was reasonable and the result of these searches was admissible in evidence. The need for effective law enforcement, we feel, outweighs the defendants' right of privacy under exceptional circumstances such as these.

The defendants are found guilty under the Second Count of the indictment.